# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**PAN AM FLIGHT 73 LIAISON GROUP,**

    **Movant,**

       **v.**                                  **No. 10-mc-0077 (JDB)**

**GIATRI DAVÉ & GARGI DAVÉ,**

    **Respondents.**

## MEMORANDUM OPINION

This action arises out of a dispute over the enforceability of a contract -- termed the Joint Prosecution Agreement ("JPA" or "the Agreement") -- by which victims of the 1986 hijacking of Pan Am Flight 73 agreed to jointly pursue legal remedies. Giatri Davé and Gargi Davé, victims of the hijacking and respondents here, brought suit in California state court seeking a declaratory judgment that the JPA was unenforceable. The Pan Am Flight 73 Liaison Group ("the LG"), a defendant in the Davés' California action and the movant here, thereafter initiated this action to compel the Davés to arbitrate their claims. It also has moved for a preliminary injunction seeking to hold in escrow disputed assets. For their part, the Davés have moved to transfer this case, or to stay the case pending the termination of the California action. The Court heard oral arguments on the parties' motions on March 4, 2010. In an order issued on May 7, 2010, the Court granted the LG's motion to compel arbitration, and denied both the Davés' motion to transfer or to stay, and the LG's motion for a preliminary injunction.[1] This opinion articulates the

---

[1] The Davés filed a motion for a temporary restraining seeking to stay arbitration proceedings on May 3, 2010, which precipitated the need for the May 7 order. The Court has denied as moot the Davés' motion. See May 7, 2010 Order [Docket Entry 37], at 2.

reasons for those decisions.

## I.

Four members of the Abu Nidal Organization, allegedly operating with financial and logistical support from Libya, hijacked Pan Am Flight 73 on September 5, 1986. By the end of that terrible ordeal, the hijackers had killed twenty passengers and injured another approximately 130 passengers. In 2004, a group of victims -- and in some cases their representatives or estates -- decided to pursue jointly "legal remedies, including a civil action, against the Libyan State . . . , and certain individuals implicated [in] and convicted of carrying out the hijacking." LG's V. Mot. to Compel Arbitration ("LG's Arbitration Mot.") [Docket Entry 3], Ex. A (JPA), 1. To do so, the victims executed the JPA, which, among other things, created the LG to act as the managing agent for the victims' collective legal claims. See LG's Arbitration Mot. at ¶ 14; JPA at p.1. The LG comprises five individuals -- residents of Connecticut, New York, North Dakota, Ohio, and India -- who were "either victims of the Pan Am Flight 73 hijacking themselves or were family members of individuals killed during the hijacking." LG's Arbitration Mot. at ¶ 2. It is tasked with "maintaining and overseeing the conduct of all litigation, settlement, and collection efforts," and "act[ing] in the interests of the Parties respecting any issues arising during the" prosecution of the victims' claims. JPA at ¶ 6.

With the LG as their managing agent, the parties to the JPA agreed not only to "jointly pursue their legal claims in the same proceedings and subsequent collection efforts," but also to "share in the recovery arising from any proceedings." Id. at p.2. The victims selected Crowell & Moring LLP, an international law firm, to represent them, and agreed that "[t]o the extent there is any financial recovery against any of the Defendants, either jointly or severally, either by way of

settlement, judgment or other award, all monies shall be deposited in the Crowell & Moring LLP IOLTA account." Id. at ¶ 2. After payment of litigation expenses and attorneys' fees, the remaining funds would be distributed to the victims according to a formula set forth in the JPA. See id. at ¶ 5. Moreover, the JPA parties agreed to mediate any dispute regarding "the construction and enforceability of the Agreement or any actions or disputes arising under or in connection with the Agreement." Id. at ¶¶ 13-14. And they agreed that if mediation were unsuccessful, they would submit their dispute "for confidential arbitration under the provisions of the American Arbitration Association" before a three-member arbitration panel. Id. Arbitration under the Agreement must be held in the District of Columbia. See id. at ¶ 13.

Giatri Davé and Gargi Davé, both United States citizens, were passengers on Pan Am Flight 73. See LG's Arbitration Mot., Ex. D (Davés' Cal. Compl.), ¶ 1. They both became parties to the JPA in 2005 "by virtue of each executing a Joinder to [the] Pan Am Flight 73 Joint Prosecution Agreement." LG's Arbitration Mot. at ¶ 18. In doing so, the Davés "agree[d] to be bound by all terms, conditions and covenants contained in the Agreement." Id., Ex. B (Davés' JPA Joinders), 1, 4. And in their joinders, they each represented that they had read "the terms, conditions, and covenants of the Agreement"; had "underst[ood] all terms and conditions of the Agreement and agree[d] to be bound by its terms"; and had "been represented by an attorney in the review of the Agreement and the decision to execute [the] Joinder, or . . . had the opportunity to do so, and elected not to do so." Id. at 1-2, 4-5. Approximately 180 individuals -- both U.S. nationals and non-U.S. nationals -- became parties to the JPA.

Pursuant to the Agreement, Crowell & Moring filed a lawsuit against Libya in the United States District Court for the District of Columbia. See LG's Arbitration Mot. at ¶ 15; see also

Manjula Patel v. The Socialist People's Libyan Arab Jamahiriya, Civ. A. No. 06-0626 (D.D.C. filed Apr. 24, 2006). Crowell purportedly pursued the case "actively" during the ensuing two years. See LG's Arbitration Mot. at ¶ 15. As Crowell was litigating the victims' claims, Congress passed the Libyan Claims Resolution Act, Pub. L. No. 110-301, 122 Stat. 2999 (2008), which set forth procedures to govern how individuals would be compensated if the United States and Libya were to settle outstanding terrorism-related claims by U.S. citizens against Libya.

Two weeks after Congress passed the Libyan Claims Resolution Act, the United States and Libya signed the Claims Settlement Agreement Between the United States of America and the Great Socialist People's Libyan Arab Jamahiriya ("Claims Settlement Agreement"). See Claims Settlement Agreement, available at http://www.state.gov/documents/organization/ 109771.pdf. The stated objective of the Claims Settlement Agreement was to "reach a final settlement of the Parties' claims, and those of their nationals"; "terminate permanently all pending suits"; and "preclude any future suits" based on past terrorist actions or military measures taken by the United States or Libya. Claims Settlement Agreement, Art. I. As part of the settlement, Libya and the United States "agree[d] to authorize the establishment of a humanitarian settlement fund . . . as the basis for settling the claims and terminating and precluding . . . suits." Id., Art. II. Libya contributed $1.5 billion to the fund. See id., Annex. Fulfilling his duty under the treaty, President Bush thereafter espoused and settled all existing terrorism-related claims by United States nationals against Libya. See Exec. Order No. 13,477, 73 Fed. Reg. 65,965, at 65,965 (Oct. 31, 2008). In his executive order, President Bush also granted the Secretary of State the authority to promulgate "procedures governing application of United States nationals with [terrorism-related] claims . . . for compensation for those claims." Id.

-4-

Consistent with the Libyan Claims Resolution Act and Executive Order 13,477, the Department of State paid monetary awards to parties that previously held pending wrongful death claims against Libya. See LG's Arbitration Mot. at ¶ 15. The State Department also "referred 'for adjudication and certification' claims for physical injury and, later, six other forms of injury to the [Foreign Claims Settlement Commission]," id., an entity within the Department of Justice that adjudicates claims of U.S. nationals against foreign governments, see 22 U.S.C. § 1622. Because Executive Order 13,477 terminated the JPA parties' pending case against Libya, Crowell & Moring "pursued recovery under the Claims Settlement Agreement for all JPA Parties eligible to make claims under it, including the Davés." LG's Arbitration Mot. at ¶ 15.

In July 2009, the Foreign Claims Settlement Commission awarded Gargi Davé money for a claim that Crowell & Moring had submitted to it. See LG's Arbitration Mot., Ex. C (Decl. of Clifton Elgarten), ¶ 2. And in November 2009, Crowell & Moring notified Gargi Davé that her award had "been certified for payment by the United States Department of Treasury," and therefore the firm expected that "Treasury will soon be contacting both you and our firm to arrange for a method of payment of this award." Id. at ¶ 3 (internal quotation marks omitted). Pursuant to the terms of the JPA, Crowell & Moring "provided Ms. Davé with a form of directive to the Treasury Department that she could use to direct payment of the funds to [Crowell & Moring's IOLTA] account." Id. at ¶ 15.

Gargi Davé, however, never returned the executed documents to the firm. See id. Instead, she, along with her sister Giatri Davé, filed a declaratory judgment action in the Superior Court of California, County of Los Angeles, requesting that, to the extent the JPA required them to share their Foreign Claims Settlement Commission awards with the other parties to the JPA,

the Agreement be found unenforceable due to fraud, unconscionability, and the fact that it conflicts "with the terms, intent and policies of the United States under the" Claims Settlement Agreement, Libyan Claims Resolution Act, and Executive Order 13,477. Davés' Cal. Compl. at ¶ 17. They also raised several common law contract and tort claims against the LG and Crowell & Moring. The defendants removed the case to the Central District of California. See Davé v. Crowell & Moring LLP, Civ. A. No. 10-00172 (C.D. Cal. removed Jan 11, 2010).

In response to the Davés' suit in California, the LG filed this action, seeking to compel the Davés to arbitrate the claims asserted in their California complaint pursuant to the terms of the JPA. In addition, the LG filed a motion for a preliminary injunction asking the Court to order that the Davés' Foreign Claims Settlement Commission awards be held in escrow pending the start of arbitration. See Mots. Hr'g Tr. 34:21-35:3, Mar. 4, 2010.[2] For their part, the Davés oppose both the LG's motion to compel arbitration and its motion for a preliminary injunction. And they have asked this Court either to transfer this action to the United States District Court for the Central District of California, or to stay this action pending resolution of the California case. See Davés' Mot. to Transfer or to Stay ("Davés' Transfer Mot.") [Docket Entry 12], at 2.

## II.

The Court begins its analysis with the Davés' motion to transfer or to stay because it presents a "threshold ground[] for denying audience to a case on the merits." Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 585 (1999); see also Sinochem Int'l Co. Ltd. v. Malaysia Int'l

---

[2] The Court has entered a stipulated consent order precluding any person from dissipating the Davés' compensation award "until the Court issues a decision on the LG's motion for a [preliminary injunction]." January 29, 2010 Stipulated Consent Order [Docket Entry 10], at 1. Pursuant to that order, the disputed award currently resides in an interest-bearing trust account maintained by the Davés' counsel.

Shipping Corp., 549 U.S. 422, 431 (2007).

     The Davés argue that this action presents "the identical issues of fact and law which are the basis of [their] action in California -- and which could have been brought in the California [court] which has jurisdiction and venue." Davés' Transfer Mot. at 2. Therefore, in their view, this Court should transfer the action to the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1404(a). See id. But the Davés' California action is no longer in federal court -- pursuant to a motion filed by the Davés, the district court recently remanded the case to the Superior Court of California, Los Angeles County. See Davé v. Crowell & Moring LLP, Civ. A. No. 10-172, 2010 U.S. Dist. LEXIS 43397, at *7 (C.D. Cal. May 4, 2010). Therefore, the Court cannot transfer this action to the Central District of California.[3]

     Nevertheless, the Davés contend that if the Court does not transfer the case, it should stay this action "pending the resolution of the California action." Davés' Transfer Mot. at 2. In other words, they ask the Court to defer to an earlier-filed action. See Davés' Reply in Supp. of Transfer Mot. [Docket Entry 20], at 5-6. Here, the district court remanded the Davés' California action; thus, the earlier-filed action that the Davés ask this Court to defer to is a state court proceeding. But federal courts do not defer to pending state court proceedings: "'the pendency of an action in the state court is no bar to proceedings concerning the same subject matter in the

_____

[3] Nor can the Court construe the Davés' motion as a request to transfer this suit to the Superior Court of California. A federal court cannot transfer a case to state court pursuant to 28 U.S.C. § 1404(a). See Pope v. Atlantic Coast Line R.R. Co., 345 U.S. 379, 384 (1953) ("Section 1404(a), by its very terms, speaks to federal courts; it addresses itself only to that federal forum in which a lawsuit has been initiated; its function is to vest such a federal forum with the power to transfer a transitory cause of action to a more convenient federal court."); id. (section 1404(a) "does not speak to state courts"); cf. Sinochem, 549 U.S. at 430 ("For the federal court system, Congress has codified the doctrine and has provided for transfer, rather than dismissal, when a sister federal court is the more convenient place for trial of the action.").

Federal court having jurisdiction.'" Colo. River Water Conservation Dist. v. United States, 424

U.S. 800, 817 (1976) (quoting McClellan v. Carland, 217 U.S. 268, 282 (1910)); see also id.

("Th[e] difference in general approach between state-federal concurrent jurisdiction and wholly

federal concurrent jurisdiction stems from the virtually unflagging obligation of the federal courts

to exercise the jurisdiction given them.").[4]  The Court therefore will not stay this action in favor

of the parallel state proceeding in California, and hence turns to the merits of the LG's motion to

compel arbitration.

### III.

The Federal Arbitration Act provides that "a written provision in . . . a contract to settle

by arbitration a controversy . . . arising out of such contract . . . shall be valid, irrevocable, and

enforceable save upon any grounds as exist at law or in equity for the revocation of any contract."

9 U.S.C. § 2.  Because the Act creates a strong presumption favoring the enforcement of

arbitration agreements, see Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25, arbitration must be

ordered unless it can be said with certainty either that the arbitration provision cannot be

interpreted to cover the dispute, see AT&T Techs., Inc. v. Commc'n Workers of Am., 475 U.S.

---

[4] To be sure, there are limited circumstances in which abstention in favor of a pending state court proceeding may be appropriate.  See Colo. River, 424 U.S. at 813-18 (discussing abstention doctrines).  None of those exceptions is present here, however.  In any event, abstention would be particularly unwarranted because the Supreme Court has held there is "substantial room for doubt" that a party can obtain an order from a state court compelling arbitration.  See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 26-27 (1983).  Under section 4 of the Federal Arbitration Act, which governs the LG's motion to compel arbitration, a party "may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in [an] agreement."  9 U.S.C. § 4 (emphasis added).  The Supreme Court has recognized that the phrase "United States district court" may not oblige a state court to compel arbitration.  See Moses H. Cone Mem'l Hosp., 460 U.S. at 26 & n.35.  The "probable inadequacy of the state-court proceeding to protect [the LG's] rights" renders abstention inappropriate.  Id. at 26.

643, 650 (1986), or that the arbitration provision is unenforceable as a matter of contract law, see Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445-46 (2006).  Here, the Davés do not dispute that the JPA's arbitration provision encompasses the claims raised in their California complaint.[5]  They do contend, however, that "the arbitration provision itself, which is contained in the [JPA], is not a valid and enforceable agreement."  Davés' Opp'n to the LG's Arbitration Mot. ("Davés' Arbitration Opp'n") [Docket Entry 14], at 1.

State contract law governs whether there is an enforceable agreement to arbitrate.  See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995).  Here, that is District of Columbia law.  See JPA at ¶10 ("This Agreement, including its terms and definitions as well as any actions or disputes arising hereto, shall be governed by District of Columbia substantive law . . . .").  A "contract's validity is [generally] considered by the arbitrator in the first instance." Buckeye Check Cashing, 546 U.S. at 446.  Only where a party challenges the validity of the arbitration provision itself may a court assess whether the parties have consented to arbitrate. See id. at 445-46; Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403-04 (1967).

"[I]f the party opposing arbitration contends that no agreement to arbitrate was entered, which effectively raises the issue whether there was a meeting of the minds on the agreement to arbitrate, the standards for resolving a summary judgment motion pursuant to Fed. R. Civ. P. 56 should be applied."  Booker v. Robert Half Int'l, Inc., 315 F. Supp. 2d 94, 99 (D.D.C. 2004); accord Brown v. Dorsey & Whitney, LLP, 267 F. Supp. 2d 61, 67 (D.D.C. 2003).  "[T]he party asserting the existence of a contract [to submit disputes to arbitration] has the burden of proving

---

[5] Nor could they: the arbitration agreement is broadly worded, and covers any challenge "either regarding the construction and enforceability of the Agreement or any actions or disputes arising under or in connection with the Agreement."  JPA at ¶ 13.

its existence." Bailey v. Fed. Nat'l Mortgage Ass'n, 209 F.3d 740, 746 (D.C. Cir. 2000).

It is therefore appropriate to grant a party's motion to compel arbitration when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking to compel arbitration bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In determining whether there is a genuine issue of material fact sufficient to preclude summary judgment, the non-movant's statements should be accepted as true and all inferences should be drawn in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. Thus, the non-moving party cannot rely on mere speculation or a compilation of inferences to defeat a motion for summary judgment. See Hutchinson v. Cent. Intelligence Agency, 393 F.3d 226, 229 (D.C. Cir. 2005). Nor can the non-moving party rely on hearsay statements or conclusory statements with no evidentiary basis to establish a genuine issue of material fact. See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp., 564 F.3d 462, 465 (D.C. Cir. 2009). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). Moreover, a moving party may succeed on summary judgment by pointing to the absence of evidence proffered by the non-moving party. See Celotex, 477 U.S. at 322.

Here, the Davés raise three arguments in support of their assertion that the JPA's arbitration provision is unenforceable: "(1) it is unconscionable in that the Davés lacked

meaningful choice and its terms unreasonably favor the LG both substantively and procedurally; (2) it was secured by fraudulent misrepresentations and omissions; and (3) it conflicts with the terms of federal legislation and undermines serious federal interests in foreign affairs." Davés' Arbitration Opp'n at 1.

## A.

A "'contract may be unconscionable either because of the manner in which it was made or because of the substantive terms of the contract.'" Urban Invs., Inc v. Branham, 464 A.2d 93, 99 (D.C. 1983) (quoting Bennett v. Fun & Fitness of Silver Hill, Inc., 434 A.2d 476, 480 (D.C. 1981)). That is, in examining whether a contract is unconscionable, the Court must determine whether one party lacked a meaningful choice and whether the contract terms were unreasonably favorable to the other party. See Riggs Nat'l Bank v. District of Columbia, 581 A.2d 1229, 1251 (D.C. 1990); Urban Invs. Inc, 464 A.2d at 99; Williams v. Walker-Thomas Furniture Co., 350 F.2d 445, 450 (D.C. Cir. 1964). Generally, a party must prove both elements for a court to find the contract unconscionable. See Riggs, 581 A.2d at 1251 ("To establish unconscionability . . . the District must prove not only that one of the parties lacked a meaningful choice but also that the terms of the contract are unreasonably favorable to the other party." (emphasis added)); but see Bennett, 434 A.2d at 480 n.4 ("[I]n an egregious situation, one or the other may suffice."). The Davés have not demonstrated that either element is present here.

## 1.

In support of their assertion that they lacked meaningful choice, the Davés allege the following: "the arbitration agreement was drafted by the LG and LG's counsel," who had "far superior bargaining power and legal sophistication in the subject matter"; "the JPA[] containing

the arbitration provisions was mailed in boiler-plate form" with "no explanation of its terms"; and the arbitration provision "was inconspicuously hidden in two paragraphs on page 17 of a twenty page document." Davés' Arbitration Opp'n at 8, 10. In other words, they contend that they did not have a fair opportunity to understand the terms of the arbitration provision.[6]

Mere inequality of bargaining power, by itself, is insufficient to render an arbitration provision unenforceable. See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 33 (1991); Booker, 315 F. Supp. 2d at 102. Nor does the fact that one party to a contract may have been without technical legal expertise render the provision unenforceable. See Olle v. 5401 W. Ave. Residential, LLC, 569 F. Supp. 2d 141, 146 (D.D.C. 2008) ("The plaintiffs contracted to purchase a $2.5 million condominium and have not alleged that they lack the basic educational or financial wherewithal to negotiate a real-estate purchase contract or its attendant arbitration clause." (emphasis added)). Rather, "[w]hat is important is that [the Davés] had the opportunity to read and understand the Agreement before [they] signed it." Booker, 315 F. Supp. 2d at 102 (emphasis omitted).

Here, the Davés had that opportunity: they each took several months to review the JPA and its arbitration provision before signing it. See LG's Reply in Supp. of Arbitration Mot. [Docket Entry 17], Decl. of Stuart H. Newberger, at ¶ 22 ("Our records reflect that Ms. Gargi Davé signed the Joinder and became party to the JPA . . . approximately three months after she was initially contacted; Ms. Giatri Davé signed her joinder five months later . . . ."). Nor,

_____

[6] The Davés also allege that they were "told they had no viable alternative but to sign the JPA with the arbitration provision." See Davés' Arbitration Opp'n at 9. But this is an argument about the unenforceability of the contract as a whole, rather than the arbitration clause specifically. Accordingly, it is properly for the arbitrator to resolve. See Buckeye Check Cashing, 546 U.S. at 449.

contrary to their argument, was the provision "hidden in a maze of fine print," Walker-Thomas, 350 F.2d at 449; instead, it was written in the same font as the rest of the Agreement, and therefore easily visible to anyone reading it, see Nur v. K.F.C., USA, Inc., 142 F. Supp. 2d 48, 51 (D.D.C. 2001) (permissible to write arbitration provision in same font as other provisions of the contract). And, upon becoming a party to the JPA, the Davés indicated that they had "been represented by an attorney in the review of the [JPA] and the decision to [join the JPA], or . . . had the opportunity to do so, and elected not to do so." See Davés' JPA Joinders at 2.

Taken together, these facts demonstrate that the Davés had a fair opportunity to understand the terms of the JPA and its arbitration provision. See Olle, 569 F. Supp. 2d at 146 (that "the plaintiffs had fifteen days to review and cancel [an arbitration agreement]" indicated they had a meaningful opportunity to consider it); cf. Sullenberger v. Titan Health Corp., Civ. A. No. S-08-2285, 2009 U.S. Dist. LEXIS 46586, at *6 (E.D. Cal. May 20, 2009) (arbitration provision unconscionable where employer told individual that he "needed to sign all of the documents right then, in the employer's presence or he would not be hired" (quotation omitted)). "That [the Davés] may not have comprehended the implications of" their decision to accede to the JPA and its arbitration provision "is irrelevant as to whether the agreement is valid." Nur, 142 F. Supp. 2d at 51. Indeed, "[u]nder District of Columbia law, there is no requirement that [a party] explain or point out that an arbitration provision is included in the contract." Adams v. Am. Residential Servs., Civ. A. No. 02-0410, 2003 U.S. Dist. LEXIS 26478, at *21-22 (D.D.C. May 8, 2003); accord Emeronye v. CACI Int'l, Inc., 141 F. Supp. 2d 82, 86 (D.D.C. 2001) ("The fact that plaintiff does not recall signing the agreement, that she had other paperwork to complete, or that the arbitration provision was not explained to her is insufficient to render the

contract unenforceable.").  Accordingly, the Davés did not lack meaningful choice.

**2.**

Nor do the terms of the arbitration clause "unreasonably favor" the LG.  To support their contention, the Davés allege the following: the arbitration provision together with its forum selection clause require all of the parties to the JPA to travel to Washington, D.C. to arbitrate their disputes; the costs of arbitration are prohibitive for the Davés relative to the LG; and the procedures that would be used during an arbitration of the Davés' claims would limit their ability to obtain fair relief.  See Davés' Arbitration Opp'n at 11-13.

The Davés believe that the arbitration provision, and its forum selection clause, unreasonably favors the LG because it requires the JPA parties to travel to the District of Columbia and therefore "litigate [any] dispute several thousand miles away" from their homes.  But the Davés fail to explain how this fact favors the LG, when none of the LG's members reside in the District of Columbia -- indeed, each of the LG's members would have to travel to the District to participate in any arbitration.  Moreover, even if the Davés could demonstrate that the District was more convenient for the LG members than for themselves, where a party alleges that a clause would result in "inconvenience," it faces a "heavy burden of proof" to substantiate that argument.  See Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 591-92 (1991); see also Commerce Consultants Int'l, Inc. v. Vetrerie Riunite, S.p.A., 867 F.2d 697, 700 (D.C. Cir. 1989) (forum selection clause enforced despite serious doubts about the fairness of jurisdictional rules of discovery in the transferee court); Joyner v. Reno, 466 F. Supp. 2d 31, 37 (D.D.C. 2006) (forum selection clause enforced where statute of limitations had run in transferee forum).  Here, the fact that the JPA may require parties from all over the world to travel to the District fails to

demonstrate that enforcement of the JPA's forum selection clause will create the kind of grave inconvenience needed to abrogate a contractual agreement.[7]

Nor can the Davés show unconscionability by observing that the LG's counsel is located in the District of Columbia -- the jurisdiction in which arbitration must take place.  See Davés' Arbitration Opp'n at 11-12.   The mere fact that LG has selected counsel located in the District of Columbia does not render the arbitration provision unconscionable -- the Davés too are free to select counsel located in the District and knowledgeable about District law.

The Davés' allegation that the costs of arbitration are prohibitive fares no better.  A "party seek[ing] to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive . . . bears the burden of showing the likelihood of incurring such costs." Green Tree Fin. Corp. - Ala. v. Randolph, 531 U.S. 79, 92 (2000); see also Adams, 2003 U.S. Dist. LEXIS 26478 at *29.  The Davés contend that the "arbitration agreement['s] terms regarding costs are unreasonably favorable to . . . the LG."  Davés' Arbitration Opp'n at 13.  But they offer no specific facts, as they must, to support this conclusion -- for example, "'the expected cost difference between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims.'"  Toledano v. O'Connor, 501 F. Supp. 2d 127, 148-49 (D.D.C. 2007) (quoting Bradford v. Rockwell Semiconductor Sys., Inc., 238 F.3d 549, 556 (4th Cir. 2001)).  Indeed, arbitration may be a less costly alternative to formal litigation.  See

---

[7] Because the parties to the JPA reside across the globe, the Agreement reasonably selected a single, predictable locus of activity for the contract.  See Scherk v. Alberto-Culver Co., 417 U.S. 506, 516 (1974) ("A contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is . . . an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction.").  Absent a forum selection clause, the JPA parties could be subject to dispute resolution proceedings across the globe -- a potentially inefficient and chaotic outcome.

Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 123 (2001) ("Arbitration agreements allow parties to avoid the costs of litigation.").[8]

Finally, the Court is not persuaded that the procedures of an arbitration panel would preclude the Davés from obtaining fair relief. Specifically, the Davés believe that the required confidentiality of arbitration proceedings will "prevent[] the terrorism victims . . . [from benefitting] from the efforts of others who challenge the contract and the arbitration agreement." Davés' Arbitration Opp'n at 13; see also id. at 14 ("[O]ther U.S. nationals who are not parties to such arbitration proceedings will have no knowledge of these [completed arbitrations] because the arbitration provision requires all proceedings to be confidential."). This is incorrect: the JPA does not require confidentiality among the parties to the Agreement. See JPA at ¶ 9 ("The Parties will not disclose any of the matters arising from this Agreement to any third party . . . ." (emphasis added)). Hence, all JPA parties may obtain the insight of parties who have challenged the JPA previously.[9]

---

[8] The Davés cannot salvage their unsubstantiated allegation of prohibitive costs by indicating that "the terms [of the arbitration agreement] permit the LG and its counsel to utilize the [remaining] funds [from the victims' compensation] to pay for the costs of arbitration and any litigation." Davés' Arbitration Opp'n at 12. This fact is of no moment -- it is appropriate for the LG to use the resources obtained under the terms of the JPA to defend the Agreement's validity, for all other parties to the Agreement have an interest in seeing it upheld. The non-challenging JPA parties are simply paying litigation costs by using common funds, of which the Davés' disputed awards are not a part. Hence, that the LG may use funds common to the non-challenging JPA parties in an arbitration against the Davés neither bears on the relative costs of arbitration nor burdens the Davés' ability to pay for arbitration.

[9] Although the Davés also suggest that arbitration is unconscionable "because arbitration proceedings do not have the effect of non-mutual collateral estoppel," Davés' Arbitration Opp'n at 13, courts have recognized that an arbitration panel may apply collateral estoppel, see Bear, Stearns & Co., Inc., Bear, Stearns Sec. Corp. v. 1109580 Ontario, Inc., 409 F.3d 87, 91-92 (2d Cir. 2005).

Taking another tack, the Davés posit that because the LG may be "a repeat player in confidential proceedings, other parties who challenge the JPA will be at a disadvantage as the arbitrators will have a financial incentive to rule in favor of the LG." Davés' Arbitration Opp'n at 14-15. In other words, the Davés worry that if multiple parties want to challenge the JPA, the arbitrators will rule consistently in favor of the LG, as it will be the source of future business. But even if parties who challenge the JPA cannot combine their actions in arbitration -- and there is nothing in the Agreement that limits joinder -- the D.C. Circuit has concluded that the mere possibility of bias is insufficient to render arbitration inappropriate. See Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465, 1485 (D.C. Cir. 1997). And, to the extent that such bias may exist, the Cole court discounted the likelihood of it producing any harm: "it is unlikely that such corruption would escape the scrutiny of plaintiffs' lawyers or appointing agencies like the [American Arbitration Association]. Corrupt arbitrators will not survive long in the business." Id.[10] For all these reasons, the Davés have not demonstrated that the arbitration panel's procedures unreasonably favor the LG.

**B.**

The Davés next assert that the LG fraudulently induced them to agree to the arbitration provision. According to them, the LG, "as their fiduciary legal representative," "knowingly and fraudulently failed to disclose several facts which go to the heart of the arbitration agreement," and which apparently led the Davés to accede to the JPA. Davés' Arbitration Opp'n at 17. The

---

[10] Cole dismissed these concerns in the context of arbitrating "public law claims," such as those under Title VII. See Cole, 105 F.3d at 1485. In such cases, courts are particularly vigilant in ensuring that arbitration permits the prospective litigation to "effectively . . . vindicate [his or her] statutory cause of action." Gilmer, 500 U.S. at 28.

Davés identify four material facts that the LG purportedly failed to disclose: the "serious conflicts of interest between Americans and non-U.S. nationals"; that Crowell & Moring's "interests were aligned against the American parties such as the Davés"; that "the arbitration clause is intertwined with a confidentiality clause which was designed by the LG and [Crowell & Moring] to perpetuate their fraud on the Americans who were never warned of their serious conflicts of interest"; and "the financial and legal costs of arbitration, such as the absence of joinder and discovery in [the] arbitration setting." Id. at 17, 20, 22. These arguments do not convince the Court that arbitration is unwarranted.

A party can only avoid arbitration if the party demonstrates that the arbitration provision itself is invalid -- the party cannot rely on the unenforceability of the contract containing the provision. See Buckeye Check Cashing, 546 U.S. at 449; Prima Paint Corp., 388 U.S. at 403-04. Here, the Davés' first two allegations of fraud -- that there was a conflict of interest between U.S. national and non-U.S. national parties to the JPA, and that Crowell & Moring's interest were aligned against the U.S. national parties -- are challenges to the Agreement as a whole. Indeed, they are the very same concerns that purportedly render the entire JPA unenforceable.[7] And where, as here, an allegation may support a challenge to a contract generally, as well as to its arbitration provision specifically, the party must demonstrate that he was "fraudulently induced to specifically enter the arbitration clause." Lok Tio v. Wash. Hosp. Ctr., Civ. A. No. 04-0701,

---

[7] See, e.g., Davés' Cal. Compl. at ¶ 119 ("The consent of Plaintiffs to the JPA was . . . obtained by . . . failing to disclose that should there be any settlement agreement between Libya and the U.S., the U.S. would only be able to represent and satisfy the claims of the U.S. nationals."); id at ¶ 55 ("Defendants knew or should have known the United States' espousal and settlement of claims would preempt and/or nullify all judicial claims . . . [and] Plaintiffs stood to lose substantial benefit by partnering with non-U.S. nationals . . . .").

2004 U.S. Dist. LEXIS 23503, at *16 (D.D.C. Nov. 5, 2004). The Davés have not done so, and therefore cannot rely on their first two allegations of fraud to avoid the arbitration clause.[8]

Nor can they demonstrate fraud by alleging that "the arbitration clause is intertwined with a confidentiality clause which was designed . . . to perpetrate [a] fraud on the Americans who were never warned of their serious conflicts of interest." Davés' Arbitration Opp'n at 22. A party "may not . . . establish a connection between the alleged fraud and the arbitration clause in particular merely by adding the allegation that the arbitration clause was part of the overall scheme to defraud." Campaniello Imports, Ltd. v. Saporiti Italia, S.p.A., 117 F.3d 655, 668 (2d Cir. 1997). Rather, the party must aver "particularized facts specific to the . . . arbitration clause which indicate how it was used to effect the scheme to defraud." Id. at 667. This is so because a contrary rule would permit a plaintiff to avoid arbitration whenever the plaintiff alleged fraud. See Garten v. Kurth, 265 F.3d 136, 144 (2d Cir. 2001). The Davés' papers, however, are devoid of such particularized facts.

Finally, the Davés cannot demonstrate that the LG fraudulently induced them to agree to the arbitration provision by asserting that the LG failed to disclose the legal and financial costs of arbitration. The information about the arbitration procedures that the LG purportedly did not disclose to the Davés is presented on the face of the JPA. For example, the Davés object to the fact that "[t]he LG did not disclose to the U.S. nationals that they would be required to hire attorneys familiar with the law of the District of Columbia." Davés' Arbitration Opp'n at 20. But

_____

[8] The Davés posit that because of these omissions, they "had no information by which to evaluate or to understand the ramifications of the agreement to arbitrate." Davés' Arbitration Opp'n at 19. But "[t]hat [they] may not have comprehended the implications of" their decision to accede to the JPA and its arbitration provision "is irrelevant as to whether the agreement is valid." Nur, 142 F. Supp. 2d at 51.

the JPA states that its terms, and any disputes arising under it, "shall be governed by District of Columbia substantive law, regardless of choice of law principles." JPA at ¶ 16. And although the Davés contend that the LG "did not disclose that any attempts to pursue discovery in arbitration are allowed 'solely at the discretion of the arbitration panel,'" Davés' Arbitration Opp'n at 21 (quoting JPA at ¶ 14), they have themselves quoted the language of the JPA that reflects this requirement, see JPA at ¶ 14.[9] Moreover, their allegation that the LG failed to disclose the expected costs of arbitration is similarly infirm, as it merely repackages the unconscionability argument the Court has already rejected. As the Court concluded above, the Davés have failed to demonstrate, at the least, that the expected costs of arbitration are significantly greater than the costs of litigation, and the likelihood of incurring such "significantly greater" costs. See Green Tree Fin. Corp., 531 U.S. at 92.

## C.

The Davés lastly contend that they cannot be bound by the arbitration provision because "it conflicts with the terms of federal legislation and undermines serious federal interests." Davés' Arbitration Opp'n at 1. Specifically, they assert that "compelling arbitration would subject U.S. citizens such as the Davés to private non-judicial review where judicial process is

---

[9] The Davés argue in the alternative that the terms of the arbitration provision violate California law. See Davés' Arbitration Opp'n at 20 ("Further, the LG did not disclose that the Davés would be required to pay for the administrative fees and the costs of three arbitrators, a provision that violates their own California state law designed to protect indigent consumers . . . ." (citing Cal. Civ. Proc. Code § 1284.3)); id. at 21 (allowing discovery at the discretion of the arbitrator violates Cal. Civ. Proc. Code § 1283.1). But California law does not apply to the claims the Davés assert in the California complaint. See JPA at ¶ 10. And, in any event, the citations do not aid the Davés. They nowhere show that they are indigent within the meaning of California law. And Cal. Civ. Proc. Code § 1283.1 applies only to agreements to arbitrate personal injury or wrongful death claims. See Christensen v. Dewar Devs., 661 P.2d 1088, 1092 n.1 (Cal. 1983).

foreclosed by federal law," id. at 24 (emphasis omitted), and that the claims presented in the

Davés' California complaint "implicate strong federal policy interests [that] cannot be subject to

arbitration," id. at 28.  Neither of these contentions convinces the Court that arbitration is

inappropriate or unenforceable here.

According to the Davés, the Libyan Claims Resolution Act "protect[s] the funds intended

for U.S. nationals from being shared with third parties" in part by prohibiting a court "from using

any judicial process -- such as an order to compel arbitration -- to facilitate review of claims to

these assets by third parties."  Id. at 24 (citing Libyan Claims Resolution Act § 4(b)(1)(A)).  In

other words, they believe that United States law precludes them from sharing their Foreign

Claims Settlement Commission awards with any other parties, and hence prohibits an arbitration

having that possible outcome.  The Court is not persuaded.  Under the Act, the Secretary of State

has the authority to "designate 1 or more entities to assist in providing compensation to nationals

of the United States, pursuant to the claims agreement."  Libyan Claims Resolution Act § 4(a)(1).

It also provides that "if the Secretary designates any entity" to assist the claims settlement

process, property held or transferred by the entity that relates to claims settlement "shall be

immune from attachment or any other judicial process."  Id. § 4(b)(1)(A).  The Libyan Claims

Resolution Act, then, protects from judicial process all claims settlement funds in the hands of

entities assisting the claims settlement process.

The Davés conclude that this immunity provision also covers claims settlement funds

once the funds are in the hands of a claimant -- in effect, they read the immunity provision to last

in perpetuity.  But such a reading of the Act is anathema to the Secretary of State's conclusion,

offered when designating entities to assist in the claims settlement process, that "property related

to the entities shall be accorded the immunity provided for in section 4(b) of the Libyan Claims Resolution Act."  Designation of Entities Under Section 4(a)(1) of the Libyan Claims Resolution Act of 2008, 73 Fed. Reg. 50,666, at 50,666 (Aug. 27, 2008) (emphasis added); see also Libyan Claims Resolution Act § 4 (immunity provisions contained in section of statute titled "Entity to Assist in Implementation of Claims Agreement").  Once such property is transferred to an individual claimant, it is no longer "related to the entities."  Moreover, the Davés' reading produces an absurd result: if the immunity provision is perpetual, individuals who have obtained claims settlement funds would forever have a cache of money untouchable in any court proceeding for any purpose.  For example, a creditor in a bankruptcy proceeding -- a third party -- would be unable to access any funds traceable to a Foreign Claims Settlement Commission award.  The Court need not adopt such an irrational reading of the Act's immunity provision when its structure supports a narrower, more reasonable interpretation.[10]  See Milavetz, Gallop & Milavetz, P.A. v. United States, 130 S. Ct. 1324, 1337 (2010) ("That '[n]o other solution yields as sensible a' result further persuades us of the correctness of this narrow reading." (quoting United States v. Granderson, 511 U.S. 39, 55 (1994) (alteration in Milavetz)).

The Davés also assert that Executive Order 13,477 "precludes claims by foreign nationals brought against American nationals that arise from injuries caused by Libyan terrorist attacks." Davés' Arbitration Opp'n at 26.  In their view, "a suit by foreigners against Americans arising from the Pan Am 73 terrorist attack falls within the category of prohibited claims under

---

[10] In any event, even if the Davés' reading of the Libyan Claims Resolution Act's immunity provision were correct, it would not render arbitration of the claims asserted in the Davés' California complaint inappropriate.  The Act only immunizes property from attachment or other judicial process -- it does not preclude judicial review or, therefore, arbitration.

Executive Order 13,477."  Id.  And because the LG has foreign members, the Davés believe that

the LG cannot bring its motion to compel arbitration against them.  See id.  Not so.  Executive

Order 13,477 precludes a party from bringing a claim within the terms of Article I of the Claims

Settlement Agreement.  Exec. Order No. 13,477 § 1(b)(ii) ("No foreign national may assert or

maintain any claim coming within the terms of Article I [of the Claims Settlement Agreement] in

any court in the United States.").  Article I, in turn, precludes a claim

> if such claim or suit is against [either the United States or Libya] or [their]
> agencies or instrumentalities, or against officials, employees, or agents therefrom
> . . . , or (where the claim or suit implicates in any way the responsibility of any of
> the foregoing) against the other Party's nationals.

Claims Settlement Agreement, Art. I (emphasis added).  By its plain terms, then, Executive

Order 13,477 only prohibits claims by foreign nationals against U.S. citizens arising out of

Libyan terrorist attacks where the suit "implicates the responsibility" of either Libya or the

United States.  But the claims asserted in the Davés' California complaint do not implicate the

responsibility of either the United States or Libya -- they seek only to determine the scope and

enforceability of the JPA, and whether Crowell & Moring and the LG abided by their contractual

commitments.  Hence, the JPA's arbitration provision is not inconsistent with either the Libyan

Claims Resolution Act or Executive Order 13,477.

The Davés' argument that the claims asserted in their California complaint cannot be

arbitrated because they implicate "strong federal policy interests" fares no better.  As the

prepotent interest, they identify "the federal policy in the treaty and statutes prohibiting judicial

process to interfere with the [Foreign Claims Settlement Commission] funds distributed to the

American citizens."  Davés' Arbitration Opp'n at 29; see also id. at 26 ("[F]ederal law prohibits

courts from changing or modifying the [Foreign Claims Settlement Commission's] decision on

the 'fair compensation' to be awarded to the Davés." (citing 22 U.S.C. § 1622g)).  Although "[t]he

decisions of the Commission with respect to claims shall be final and conclusive on all questions

of law and fact, and shall not be subject to review by . . . any court," 22 U.S.C. § 1622g, neither

this action, nor the Davés' California action, asserts any claims that challenge the Commission's

decision to award the Davés compensation.  Nor are there any claims that seek "review" of that

award.  Instead, what is at issue is simply who may share in such awards, and how.

There is nothing in the Libyan Claims Resolution Act, the Claims Settlement Agreement,

or Executive Order 13,477 to suggest that private parties may not dispose of Foreign Claims

Settlement Commission awards in any manner they choose.  Those documents contain no

constraints on an award recipient's freedom to share, assign, or make other arrangements

regarding their awards, or to refer disputes relating to such arrangements to arbitration.  Although

the penumbras of the Davés' claims in their California complaint may concern foreign relations --

the United States has an interest in ensuring that Pan Am Flight 73 victims obtain recovery --

"[t]he mere fact that an issue of national interest may incidentally figure into the resolution does

not make the dispute not arbitrable."  <u>Parsons & Whittemore Overseas Co., Inc. v. Societe</u>

<u>Generale De L'Industrie Du Papier (RAKTA)</u>, 508 F.2d 969, 975 (2d Cir. 1974).  The Davés

simply have not identified any foreign policy interests that would preclude arbitration of their

challenges.  <u>Cf.</u> <u>Davé</u>, 2010 U.S. Dist. LEXIS 43397 at *46 (the Claims Settlement Agreement,

Libyan Claims Resolution Act, and Executive Order 13,477 "do not provide Plaintiffs with any

"rights and entitlements" to which they could assert private contractual claims.").[11]

*   *   *   *   *

To summarize, although the Davés raise numerous challenges to the enforceability of the JPA's arbitration provision, their arguments are unpersuasive. They have not demonstrated that the arbitration provision is unconscionable. Nor have they shown that they agreed to the provision as a result of fraud. And none of the foreign policy interests they articulate render arbitration inappropriate.[12] Hence, the Davés must arbitrate the claims brought in their California action.

IV.

In light of the Court's determination that the Davés' claims in their California complaint must be arbitrated in accordance with the JPA, the Court will turn to the LG's motion for a preliminary injunction. The LG seeks such relief "to preserve the status quo and prevent disruption in the administration of a common fund as well as the possible dissipation of those

---

[11] The Davés attempt to supply a foreign policy interest by observing that "arbitration of this matter conflicts with . . . the procedures whereby courts consider and defer to the United States executive branch on matters affecting the national interest" because "federal law does not provide for the United States' filing of Statements of Interest in arbitration." Davés' Arbitration Opp'n at 27. At the motions hearing, the Davés' counsel represented that the United States had represented that it intended to file a statement of interest in this case. But in the more than two months that have passed since that hearing, the United States has not done so. Nor, given the fact that this action is, at bottom, a private contractual suit, is this the type of case in which the United States generally would file a statement of interest. See McDonald v. The Socialist People's Libyan Arab Jamahiriya, 666 F. Supp. 2d 50, 51-52 (D.D.C. 2009) (statement of interest filed where parties brought suit against Libya in violation of Claims Settlement Agreement).

[12] The Davés insist that they are entitled to a "full evidentiary hearing" before a jury to determine the validity of the arbitration provision. See Davés Arbitration Opp'n at 1. Not so. "Because the Court here is satisfied that the plaintiff entered into a valid agreement to arbitrate, there is no need for a trial on that issue." Brown, 267 F. Supp. 2d at 78 n.12.

funds." LG's Mem. in Supp. of Mot. for Prelim. Inj. ("LG's PI Mem.") [Docket Entry 6], at 1.

Although there is a circuit split on whether preliminary injunctive relief is available when a court

compels arbitration, compare Teradyne, Inc. v. Mostek Corp., 797 F.2d 43, 47 (1st Cir. 1986)

(relief available), and Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of N.Y, Inc.,

749 F.2d 124, 125 (2d Cir. 1984) (same), with Merrill Lynch, Pierce, Fenner & Smith, Inc. v.

Hovey, 726 F.2d 1286, 1291 (8th Cir. 1984) (relief unavailable), the Court need not address this

competing precedent here. Even if preliminary injunctive relief is available, the LG cannot

demonstrate that it is entitled to such relief.

    A preliminary injunction is an extraordinary remedy, one that should be granted only

when the moving party, by a clear showing, carries the burden of persuasion. See Mazurek v.

Armstrong, 520 U.S. 968, 972 (1997); see also Munaf v. Geren, 128 S. Ct. 2207, 2219 (2008).

To obtain a preliminary injunction, the moving party must demonstrate (1) that it would suffer

irreparable harm without injunctive relief, (2) that it has a substantial likelihood of success on the

merits, (3) that an injunction would not substantially harm the non-moving or other interested

parties, and (4) that issuance of the injunction is in the public interest. See Chaplaincy of Full

Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006); Cobell v. Norton, 391 F.3d

251, 258 (D.C. Cir. 2004).

    A district court weighing whether to grant a preliminary injunction must "'balance the

strengths of the requesting party's arguments in each of the four required areas.'" Chaplaincy of

Full Gospel Churches, 454 F.3d at 297 (quoting CityFed Fin. Corp. v. Office of Thrift

Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995)). But "[a] movant's failure to show any

irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other

three factors entering the calculus merit such relief." Id. at 297; see also Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 375 (2008) (a plaintiff must "demonstrate that irreparable injury is likely in the absence of an injunction," and not a mere "possibility"). Here, because the LG cannot show any irreparable harm without an injunction, the Court will begin its discussion with that dispositive factor.[13]

## A.

The irreparable injury requirement erects a very high bar for a movant. See Varicon Int'l v. Office of Pers. Mgmt., 934 F. Supp. 440, 447 (D.D.C. 1996). A plaintiff must show that it will suffer harm that is "more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff." Gulf Oil Corp. v. Dep't of Energy, 514 F. Supp. 1019, 1026 (D.D.C. 1981). "[T]he alleged injury must be certain, great, actual, and imminent." Hi-Tech Pharmacal Co., Inc. v. Food and Drug Admin., 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (citing Wis. Gas Co. v. Fed. Energy Regulatory Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). And "economic loss does not, in and of itself, constitute irreparable harm." Wis. Gas Co., 758 F.2d at 674 (D.C. Cir. 1985). Rather, the movant must establish that the economic harm is so severe as

---

[13] The LG suggests that the Court need not analyze their motion for a preliminary injunction under the traditional four-part test. Rather, it offers another test for assessing the propriety of injunctive relief pending arbitration: whether the relief is necessary to preserve the "status quo" pending arbitration. See LG's Reply in Supp. of Mot. for Prelim. Inj. ("LG's PI Reply") [Docket Entry 19], at 7. Although some courts have utilized this approach, they have only done so where an arbitration provision requires the parties' initial agreement to remain in effect pending arbitration -- that is, where the contract has a "status quo" provision. See Guinness-Harp Corp. v. Jos. Schlitz Brewing Co., 613 F.2d 468, 471 (2d Cir. 1980); Nat'l R.R. Passenger Corp. v. Expresstrak, LLC, Civ. A. Nos. 02-1733, 02-2012, 2003 U.S. Dist. LEXIS 24486, at *14 (D.D.C. May 1, 2003); see also Ortho Pharm. Corp. v. Amgen, Inc., 882 F.2d 806, 813 (3d Cir.1989) ("[W]e disagree that the 'preservation of the status quo' operates as a separate test for determining whether the district court acted within its jurisdictional authority."). There is no "status quo" provision in the JPA.

to "threaten[s] the very existence of [its] business." Wis. Gas, 758 F.2d at 674; accord

Experience Works, Inc. v. Chao, 267 F. Supp. 2d 93, 96 (D.D.C. 2003); Gulf Oil, 514 F. Supp. at

1025.

The irreparable harm here, according to the LG, would be the loss of the arbitration

panel's ability to order preliminary injunctive relief.[14] See Mots. Hr'g Tr. at 38:13-14; see also id.

38:5-8 (injunction "would require the Davés to hold [their] funds in escrow pending

determination of a preliminary injunction motion by the arbitrator"); id. at 40:4-9.[15] But the

arbitration panel will lose its ability to order preliminary injunctive relief only if the Davés

dissipated the funds prior to the beginning of arbitration. And the LG only speculates that the

Davés will dissipate the disputed funds -- it has provided no evidence that the Davés intend to do

so. See id. 42:7-9 ("I acknowledge that with respect to that showing, we don't have very much.").

Irreparable harm, however, cannot rest on mere possibilities. See Winter, 129 S. Ct. at 375; see

also Hi-Tech Pharmacal Co., 587 F. Supp. 2d at 11 (outcome must be "certain, great, actual, and

imminent"). Moreover, the LG has not shown that even were the Davés to dissipate their awards,

such an outcome would be irreparable. In other words, it has not demonstrated that the amount

of funds the Davés could disperse would leave an insufficient amount to protect the LG's

_____

[14] Under the rules of the American Arbitration Association, which apply to arbitrations under the JPA, an arbitrator may order preliminary injunctive relief. See Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp., 935 F.2d 1019, 1023 n.1 (9th Cir. 1991) ("'[T]he arbitrator may issue such orders for interim relief as may be deemed necessary to safeguard the property that is the subject matter of the arbitration without prejudice to the rights of the parties or to the final determination of the dispute.'" (quoting Am. Arbitration Ass'n Rule 34)).

[15] The LG alternatively argued that it would suffer irreparable harm absent an injunction because "other JPA parties will have an even greater incentive to ignore their obligations to arbitrate." LG's PI Reply at 13. At the motions hearing, however, the LG disclaimed this iteration of irreparable harm. See Mots. Hr'g Tr. at 38:5-8.

-28-

financial interests.  Nor has the LG shown that it would be unable to recover sufficient amounts from the Davés through a separate action.  Absent such evidence, the Court cannot conclude that the purported harm is irreparable.

**B.**

Because the LG cannot demonstrate that it would suffer irreparable harm absent an injunction, the Court will not engage in a lengthy analysis of the remaining factors.  <u>See</u> <u>Chaplaincy of Full Gospel Churches</u>, 454 F.3d at 297 ("A movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief.").  But given that the Court has concluded the Davés must arbitrate their claims asserted in their California complaint, it would appear that the LG has demonstrated a likelihood of success on the merits animating this action.[16]

The balance of harms is of little relevance here: it is for the arbitrator to determine whether the Davés must share their Foreign Claims Settlement Commission award under the terms of the JPA, and hence the Court cannot assess whether an injunction would harm the Davés.  And the LG has not shown that the public interest weighs in favor of an injunction.  The LG contends that "an injunction would "preserve the meaningfulness of the arbitration process"

---

[16] Both the LG and the Davés suggest that the likelihood of success element turns on the merits of the claims asserted in the Davés' California complaint.  <u>See</u> LG's PI Reply at 16; Davés' Opp'n to the LG's Mot. for Prelim. Inj. [Docket Entry 15], at 12.  But the case before this Court presents only the issue whether the Davés' claims must be arbitrated.  And therefore the propriety of the preliminary injunction the LG seeks does not turn on the merits of the Davés' underlying claims in California.  In other words, because the LG seeks an injunction to protect the ability of the arbitration panel to order preliminary relief, if an injunction from this Court were appropriate, it would be appropriate regardless of the arbitrator's ultimate decision on the merits.  This conclusion is particularly compelling here, for considering the likelihood of the LG's success on the merits of the Davés' underlying claims would "inject the court into the merits of issues more appropriately left to the arbitrator."  <u>Hovey</u>, 726 F.2d at 1292.

by ensuring the Davés do not dissipate the disputed funds. LG's PI Reply at 15. But the Court has already concluded that the LG has offered no evidence that that would happen. Therefore, because the LG has not shown that the status quo will be threatened absent an injunction, there is no threat to that public interest.

*      *      *      *      *

The LG has not demonstrated it will suffer irreparable harm without an injunction, a prerequisite for the extraordinary relief it seeks. This absence is fatal to its request for a preliminary injunction. See Chaplaincy of Full Gospel Churches, 454 F.3d at 297.

**V.**

For the foregoing reasons, the Court will deny the Davés' motion to transfer or to stay, will grant the LG's motion to compel arbitration, and will deny the LG's motion for a preliminary injunction. A separate Order to that effect was issued on May 7, 2010.

_____
/s/
JOHN D. BATES
United States District Judge

Dated: <u>May 12, 2010</u>